IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| John Murphy, *et al.*, | ) | CASE NO.  1:05 CV 2121 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| Stargate Defense Systems Corp., *et al.*, | ) | <u>MEMORANDUM OPINION</u> |
| | ) | |
| Defendants. | ) | |

This matter is before the Court subsequent to a bench trial held from October 31, 2005 through November 4, 2005.  Thereafter, the parties have filed post trial briefs on Plaintiffs' claims and Defendants' defenses.  In their Amended Complaint Plaintiffs John Murphy and James Smith seek rescission of two transactions in which they purchased stock from Defendant Stargate Defense Systems Corp. ("Stargate") or its predecessors and one transaction where they sold their company Spectrum Infrared, Inc. to Stargate for shares in Stargate.  Plaintiffs contend that they were induced to enter the transactions as a result of the fraudulent misrepresentations and omissions made by Defendants James Woodruff and Dan Ross in violation of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder, several sections of an Ohio securities fraud statute, Ohio Rev. Code §1707.44(B)(4), (C)(1) and (D) and Ohio common law.

## FINDINGS OF FACT

The Court makes the following findings of fact based upon the evidence presented at trial:

1. Spectrum Infrared, Inc. ("Spectrum") is an Ohio corporation incorporated in 1965 by Plaintiff John Murphy("Murphy") and Plaintiff James Smith ("Smith"), who were each 50 percent shareholders of Spectrum. For almost 40 years Spectrum operated a manufacturing facility in Cleveland, Ohio and during that period developed a series of products which include infrared heaters used for a variety of commercial applications. In one of those applications, Spectrum builds infrared heaters which thaw an entire rail car and components for railroad customers.

2. The Plaintiffs, who were considering retirement, placed an advertisement in the April 30, 2001 edition of Crain's Cleveland Business advertising the availability of a manufacturing business in the field of "Electrical Industrial Products".

3. On May 2, 2001, Defendant James Woodruff (Woodruff) responded to that advertisement and requested additional information about the business.  At that time Mr. Woodruff was the president of Interwoven Technologies, whose name later changed to Q Electronics or Q Corporation ("Q Corp").  Over the next several months Mr. Woodruff and Mr. Murphy exchanged several short phone calls.

4. After a period of no further communication with Mr. Woodruff, the Plaintiffs placed another advertisement in the October 29, 2001 edition of Crain's Cleveland Business.

5. On December 27, 2001, Mr. Woodruff revived the discussions by placing a call to Smith. During this telephone call Woodruff represented to Mr. Smith that Q Corp was going public in the second quarter of 2002 and that he was still interested in acquiring Spectrum.

6. After an exchange of several additional calls, a meeting was arranged in a phone call between Mr. Woodruff and Mr. Murphy to occur on the following day. During this phone call,

Mr. Woodruff represented to Mr. Murphy that Q Corp was going to market with a secondary stock offering in March with the contemplation of a reverse split. He represented that through a combination of cash and stock Q Corp had acquired a Cleveland manufacturer of electric heaters which does 60% of its business with the United States Government. He said that this business makes tent heaters for Hunter Manufacturing and that he could market Spectrum products to the government in some form of a joint venture. He stated that Q Corp was currently buying another business for 1.5 Million Dollars. During this call there was some initial discussion of the possible terms of a purchase agreement.

7. On January 4, 2002, Mr. Woodruff and Robert Mitchell (Mitchell) visited the Spectrum facility in Cleveland, Ohio and met with Murphy and Smith. At the meeting, Mr. Woodruff made several representations to Mr. Murphy and Mr. Smith, including that Q Corp has bought or was in the process of buying Panelbloc, a company with a gas infrared manufacturing business and sales of $400,000 per year.

8. Mr. Woodruff testified that he had negotiated with respect to the acquisition of various businesses, including, but not limited to, Panel Block, Delta Lightning Corporation, Copper Foil, Inc. and NUFAB.

9. On January 6, 2002, Mr. Murphy sent to Mr. Woodruff a copy of an appraisal of the Spectrum equipment done by TR Wigglesworth Machinery Co., a machinery dealer.

10. On January 14, 2002, Murphy and Woodruff had a telephone call wherein Mr. Woodruff asked for a breakdown of sales by category before making an offer. (PX 12) This breakdown was faxed from Mr. Murphy to Mr. Woodruff on that same day.

-3-

11. On January 21, 2002, Mr. Woodruff called and left a phone message for Mr. Murphy which was returned by Mr. Murphy on January 22, 2002. That call was placed to Mr. Woodruff's cell phone. During this portion of the call Mr. Woodruff represented to Mr. Murphy that Q Corp was in process of going public and that the purchase of Spectrum could be for cash or stock, but that stock would make the deal easier. The cell phone call was terminated with the agreement to reconnect on a land line later in the day. In the follow-up call on the same day,

Mr. Woodruff represented that the board of Q Corp would approve a combination deal with cash and stock and that a nonbinding Letter of Intent would be a way of avoiding legal and

accounting costs. He further suggested that Murphy should make a small investment in Q Corp stock as part of the deal.

12. On January 24, 2002, Murphy, Smith, and Leslie Atkinson, plaintiffs' personal accountant, met with Mr. Woodruff at the offices of Q Corp after normal business hours.

Mr. Murphy was led to believe at that time that Q Corp and Interwoven Electronics were the same corporations.  At this meeting Mr. Woodruff represented that Q Corp had net worth of 3.5 Million dollars, that Q Corp. and its affiliates had a total of 50 employees including two PhD's, that Q Corp plans an IPO in October, that the shares of Q Corp stock were selling at $15 per share, and that Q Corp manufactures TENS units which is a medical device to promote bone regrowth and cold light lasers which were FDA approved for medical use on animals only.  Additional terms of a letter of intent were discussed.

13. Mr. Murphy and Mr. Smith agreed to jointly purchase 400 shares of Q Corp stock and on or about January 25, 2002, Mr. Murphy gave Mr. Woodruff a check bearing number 9067 made

payable to Q Corp in the amount of $12,000 for such purpose. (PX 16) Despite this payment, no stock certificates for Q Corp were ever delivered.

14. On January 28, 2002, a draft Letter of Intent was sent by Mr. Woodruff to Mr. Murphy and an exchange of faxes occurred over the next few days.

15. Additional suggested changes were suggested by Mr. Murphy in a fax to Mr. Woodruff on January 31, 2002, along with a request for additional information from Q Corp. Mr. Woodruff thereafter spoke with Mr. Murphy on the telephone and stated that his earlier representation regarding the price of stock was mistaken and that Q Corp stock had never sold for less than $30 per share and he agreed to provide a list of shareholders showing that they had all paid $30 per share and agreed to provide the other information requested as part of an exchange of information prior to a closing of the transaction. Mr. Woodruff then faxed to Murphy and Smith a signed Letter of Intent.

16. On February 1, 2002, Mr. Murphy and Mr. Smith, signed and delivered to Mr. Woodruff the fully signed copy of the Letter of Intent. Later the same day, in a telephone call between Mr. Woodruff and Mr. Murphy, Woodruff represented that everything was in place to close on Copper Foil, a circuit board shop, the following week. They also discussed an additional investment by Mr. Murphy in Q Corp for an additional $20,000. (PX 25)

17. On February 4, 2002, Mr. Murphy agreed to purchase an additional 1000 shares of Q Corp stock and tendered his check # 9073 in the amount of $20,000 for such purchase. (PX 26) Despite this payment, no stock certificates for Q Corp were ever delivered. Mr. Woodruff explained that this stock was available for purchase at a price lower than $30 per share only because another shareholder was selling these shares under distressed circumstances due to a pending divorce.

18.  At trial, there was testimony that Murphy's $20,000 payment to Q Corp was a loan which was to be repaid in five days.  The loan was never repaid.

19.  Woodruff claims that he never told Murphy that Q Corp had a net worth of $3.5 Million. Indeed, Woodruff  knew in February 2002, that Q Corporation did not have net worth of 3.5 Million dollars because he had signed three UCC financing statements on July 5, 2001 pledging as security for a loan from Carl Viviani all of the assets of Q Corp, Interwoven Electronics Corporation, and Interwoven Technologies Corporation consisting of miscellaneous office furniture and software valued at approximately $10,000. The bank accounts of Q Corp had nominal or negative balances. Q Corp assumed substantial debt at the time of the Mitchco deal and was unable to pay that debt in a timely fashion.  In fact, such debt remains unpaid more than 3 years later.

20. Q Corp. did not manufacture cold light lasers which were FDA approved for medical use on animals. There is no evidence that such products were ever sold by Q Corp.

21. Mr. Woodruff never undertook the actions necessary to take Q Corp public and thus knew that there were no specific plans in place to take Q Corp public at any time relevant to these transactions.

22. Mr. Woodruff has been prosecuted on at least two occasions in federal court for fraudulent schemes involving investors, and misrepresenting patents, assets and contracts involving his various corporations.  In past fraudulent operations by Mr. Woodruff that resulted in federal prosecutions in Colorado and Virginia, Mr. Woodruff utilized corporations that he, and in some corporations both he and Mr. Ross, were the principal operators, including Android Corporations 1, 2 and 3, incorporated in Ohio, Florida and Delaware, Stargate Defense Systems Corporation, Stargate Q Corporation, Q

Stargate Corporation, Q Corporation, Q Electronics Corporation, Interwoven Technologies

Corporation, Interwoven Electronics Corporation, and Nevada Woodruff Corporation among others.

These were incorporated in various states, including Ohio, Delaware, Florida and Nevada.

23. In connection with a plea agreement entered in the United States District Court for the

District of Colorado, Mr. Woodruff admitted that in response to an advertisement in the Wall Street

Journal he had contacted the owner and operator of a corporation known as Fab

Tech. Using an introduction by that individual, he made several false representations to the First Bank

of Colorado Springs as a result of which he received personally and through his corporation, Nevada

Woodruff Corporation, the sum of $200,000. To obtain such funds, Mr. Woodruff falsely represented

that he was the owner of patent # 3,902,352 and

that he had sold that patent to a corporation for the sum of $6,000,000 which was being paid at the

rate of $100,000 per month for 60 months. The Defendant was also convicted of

passing bad checks and failure to appear in Ohio in 1988. He was convicted of grand theft and cocaine

possession in Florida in 1990.

24. In 1991, Mr. Woodruff formed Android Corporation in Ohio with a partner named Frank

Lomanno who was on probation from his conviction for embezzlement from the United States

Government.  In a 1993, newspaper article, Mr. Woodruff portrayed Android Corporation as a

company which has deals to acquire other corporations, 35 employees, contracts for the

sale of circuitry for life support systems for fighter pilots, 2.4 million dollars in sales which was

projected to grow to 23 million dollars in sales by 1994.  He described the plans of the corporation to

go public. In early 1993, this corporation was merged with a Delaware corporation of the same

-7-

name–both controlled by Mr. Woodruff.  Over the next

several years, Mr. Woodruff was involved in numerous corporations in several different jurisdictions

most of which are now shown on the corporate records of the various state records as being cancelled

for non-payment of corporate taxes.

25. In connection with a plea agreement entered in the United States District Court for the

Eastern District of Virginia, Mr. Woodruff admitted that in December of 1998, Woodruff formed

Interwoven Technologies Corporation (ITC) as a Delaware corporation authorized to

issue one-million shares each of voting and non-voting stock. According to the plea agreement, Mr.

Woodruff induced numerous investors in Interwoven Technologies Corporation to invest in

that corporation by false representations that ITC had received a government contract for a Laser-Bore

sighting device from the United States Army which would produce

millions of dollars in revenue for ITC. Mr. Woodruff further admitted that the investor's funds were

deposited into an account under the name of Kensington St. James Crestor for the

purpose of diversion of those funds for his personal expenses. Mr. Woodruff was convicted of

conspiracy to commit mail/wire fraud and is currently incarcerated.

26. On November 5, 2001, Mr. Woodruff filed an Amendment to the Certificate of

Incorporation of Interwoven Technologies Corporation to change its name to Q Electronics

Corporation. Mr. Murphy understood that Q Electronics Corporation (the Delaware corporation) is

also known as Interwoven Electronics Corporation.

27. On February 4, 2002, Q Corp merged with Mitchco Manufacturing, Inc., a corporation

acquired, like the transaction in this case as an exchange of stock. As part of this transaction, Q Corp

agreed to assume and pay off certain categories of debt including an outstanding line of credit with Key Bank guaranteed by the former owners. Instead of paying off this line of credit, Mr. Woodruff caused additional sums to be borrowed on this line of credit without the knowledge of at least one of the guarantors, Richard Cohen. These debts are still outstanding 3 years later. Robert Mitchell, the other partner in Mitchco was forced to file personal bankruptcy. At the time of his meeting with the Bankruptcy Trustee in November of 2003, Robert Mitchell was serving as the Chief Operating Officer and a Member of the Board of Directors of Q Corp and he testified under oath that his shares in Q Corp received as consideration for the merger were worthless.

28. On March 1, 2002, the Certificate of Incorporation of Q Electronics Corporation was cancelled for failure to file annual reports and the non-payment of taxes to the State of Delaware.

29. On or about February 20, 2002, Mr. Woodruff delivered to Mr. Murphy and Mr. Smith Q Corp and Mitchco Profit and Loss Statements and Balance Sheets for 2001 and a "Prospectus" for Q Corp. Even though the contemporaneously drafted stock subscription agreements prepared in connection with the Mitchco transaction had specific statutory disclaimers for "Forward Looking Statements" no such disclaimers were provided in connection with the Prospectus given to Mr. Murphy and Mr. Smith.

30. The Prospectus presented for Q Corp included an amalgamation of several different corporations including Delta Lighting, Copper Foil, NCM Electronics, Mitchco, Spectrum and NUFAB. The Prospectus showed financial information and projections based upon these consolidated entities. The Prospectus included numerous newspaper articles describing products which Mr.

Woodruff claimed were the subject of government contracts including a "mouse-trap" device which Woodruff claimed was a device for allowing taxi drivers to signal that something was going wrong in their taxicabs. These articles presented to Mr. Murphy by Mr. Woodruff also confirmed that Q Corporation was actively engaged in acquiring other businesses. Similar representations were made in printed materials provided by Mr. Woodruff which appeared to be downloads from the Q Corporation website.

31. On February 20, 2002, Defendant Woodruff represented that the projections in the Prospectus used the previous years' numbers and Q Corp could expect to experience greater results because of a savings in general and administrative expenses upon their consolidation. He further represented that the Delta Lighting acquisition was still in progress; that share prices in Q Corp have always been fixed at $30 per share; and that Q Corp is considering acquisition of the Roberts Surveying Co.

32. On February 27, 2002, Mr. Woodruff represented to Mr. Murphy in a telephone conversation that he was in process of completing the acquisitions of Copper Foil and Delta Lighting.

33. On March 24, 2002, Murphy faxed to Mr. Woodruff a list of requirements which would form the basis for a "Binding" Letter of Intent. Mr. Murphy and Mr. Woodruff had follow-up telephone calls in April and May of 2002.

34. Mr. Woodruff claimed during this period that Q Corp. was waiting for money from Florida Investors in order to complete the acquisition of Spectrum. At this point, it was understood by Mr. Murphy that a portion of this acquisition would require a cash payment from Stargate. Mr. Murphy was then told, on January 13, 2003, that the Florida investors have yet

to finish their purchases and that the money for acquisition of Spectrum should be available within a week. On January 20, 2003, Mr. Murphy provided an updated machinery and equipment list for Spectrum in response to a request by Mr. Mitchell.

35. On February 19, 2003, Mr. Woodruff faxed to Mr. Murphy a letter regarding a patent. In a telephone call on February 21, 2003, Mr. Murphy called to congratulate Mr. Woodruff on the issuance of this patent. Mr. Murphy is told during this call that the Florida investors are still holding things up. Mr. Woodruff also told Mr. Murphy that the military had tested Q Corp's new device and that the device scored in three tests 49 out of 50, 48 out of 50, and 50 out of 50.

36. In March of 2003, the Plaintiffs got tired of waiting for Mr. Woodruff to complete the proposed transaction with Spectrum and replaced the advertisement for sale of the business in Crain's Cleveland Business. Plaintiffs never received any serious interest from any prospective buyer for Spectrum other than Defendants.

37. On April 25, 2003, Mr. Murphy, Mr. Smith and Mr. Woodruff had a meeting in Eastlake, Ohio where Mr. Woodruff explained that due to various corporate changes, the Q Corp stock would be issued in the name of Stargate Q Corporation which was represented to be the corporation which was the only share issuing corporation.

38. In June 2003, Mr. Woodruff called Mr. Murphy and represented that Stargate Q Corporation would have 1 million dollars within 2 weeks and that $20,000 in funds borrowed in February of 2002 would be repaid then. Mr. Woodruff also stated that they would need to get serious about completing the acquisition of Spectrum; that Q Corp had been awarded a 1.75 Million dollar government contract and had another contract for 30 million dollars. He represented that the stock

certificates representing the original purchases of stock would be

delivered on the following Monday.

39. On September 19, 2003, Mr. Murphy wrote two letters to Mr. Woodruff, one dealing with

repayment of the $20,000 loan and the other dealing with the issuance of the stock

certificates from the purchases in 2001 and restating the representations made at the April 25, 2003

meeting.  Mr. Woodruff signed these letters to acknowledge his receipt of

the letters and express his agreement with their content.

40. On November 12, 2003, Mr.Woodruff represented to Mr. Murphy that Stargate Q

Corporation wanted to go forward with the purchase of Spectrum and combine Spectrum operations

with those of Panelbloc. He further repeated the representation about the 1.75 million government

contract. He stated that the detector device covered by this contract could be

manufactured for $900 and was priced at $3,400 in the contract.  He stated that he "hopes" to get the

30 million dollar contract for the hand held SG-1 detection devices.

41. On January 26, 2004, Mr. Murphy spoke with Mr. Ross on the telephone. Mr. Ross told

him that Panelbloc was not interested in being the manufacturer of the device, that the hand-held SG-1

order was "finalized" and that Mr. Ross was talking with Cleveland Dept of Economic Development to

try to find a company to replace Panelbloc to support this business already in existence.

42. On March 17, 2004, Mr. Woodruff claims that he had received 15 calls for orders of his

detection device on that day and had orders for an additional 200 to 230 units

including the sale of one unit to Spain, that he had materials on order for 500 units and that the

programing of the units was completed. Mr. Woodruff also represented that he had located

-12-

a small geiger tube which would permit manufacture of a consumer radiation detector with dimensions of ½ x 2 x 2.

43. On July 6, 2004, Mr. Woodruff claimed that Stargate was starting a government contract on July 15, 2004.

44. On September 28, 2004, Mr.Murphy and Mr. Smith were told in a meeting with Mr. Woodruff that Q Corp was now Stargate Defense Systems Corporation–a Delaware corporation. At this meeting, Mr. Murphy and Mr. Smith were shown copies of faxes and commitments related to the government contract and were told that the units would cost $800 to manufacture and would sell for between $7,000 to $10,000, that the start of the government contract had been delayed, but that they would start in two weeks with money to follow approximately two weeks later.

45. On December 6, 2004, Mr. Woodruff stated in a telephone call with Mr. Murphy that he had just returned from Washington and that Stargate had its first deliverable products under the government contract and that payment of $250,000 to $300,000 had been billed and approved. Mr. Woodruff stated that when the money comes in that Stargate was going to do a corporate repurchase of stock paying $34 per share for shares issued for $30 per share. Mr. Woodruff further stated that the next government contract which would start in approximately 2 months was for designing a prototype for actually cleaning the contaminants detected by the existing detector out of water. He claimed that this contract would be worth 3 to 3.5 Million. Woodruff also stated that he had seen a TV program suggesting that 2 tons of smallpox virus was missing in Russia and that would give a big boost to the market for biological detectors. (PX 73) Within a few days thereafter, Mr. Woodruff sent to Mr. Murphy a copy of the Project Management Plan for a United States Army Contract and sent to him

-13-

several newspaper articles describing the award of the contract to Stargate Defense Systems Corporation.

46. On February 7, 2005, Mr. Woodruff called Mr. Murphy and told him to check out the new Stargate Defense Systems Corporation website and told him that an article would be run on the following Friday in the business section of the Akron Beacon Journal. Mr. Woodruff represented that they were working with Draeger, a German corporation, and that they were expecting 10 million dollars in sales through November of 2005 with payments every two weeks from the government.

47. On or about March 16, 2005, Mr. Smith was given Certificate No. 44 representing his ownership of 1,000 shares of Stargate Defense Systems Corporation common stock signed by Mr. Ross as Secretary and Mr. Woodruff as President of that corporation. Mr. Murphy was given Certificate No. 45 representing his ownership of 3,700 shares of Stargate Defense Systems Corporation common stock signed by Mr. Ross as Secretary and Mr. Woodruff as President of that corporation. These Certificates state on their face that Stargate Defense Systems Corporation is a Delaware Corporation formerly known as Interwoven Technologies Corporation and that the corporation is authorized to issue 4 Million shares. These Certificates were issued to reflect the stock purchases made on January 25 and February 4, 2002.

48. On or about March 17, 2005, the Plaintiffs were provided a Profit and Loss Statement for Stargate for the period of November 1, 2004 through March 17, 2005. The Plaintiffs were also provided with a list of shareholders and again told that each of these shareholders paid $30 per share for their stock. Finally, the Plaintiffs were provided a copy of a Purchase Agreement which was already executed by Woodruff on behalf of Stargate.

49. The Plaintiffs executed the Purchase Agreement on March 17, 2005, but did not deliver the executed copy of the agreement to the Defendants until they had consulted with an attorney with Benesch, Freidlander, Coplan & Arnoff on March 18, 2005.  It was unclear from the evidence presented at trial whether the Benesch attorney consulted by Plaintiffs undertook any real examination of the proposed purchase.  Certainly, there was no testimony that the attorney sought or obtained any information from anyone other than the Plaintiffs and Mr. Murphy testified that he did not disclose any of the inconsistent or troubling information that he had in his possession regarding Stargate and/or Mr. Woodruff.  While there was no evidence that the specific attorney consulted by Plaintiffs had any conflict, Plaintiffs assert that Benesch, Freidlander, Coplan & Arnoff had an undisclosed actual conflict of interest having previously represented Stargate Q Corporation.

50. On March 18, 2005, after consulting with counsel, the Plaintiffs suggested that the contract should be between Plaintiffs as individual shareholders of Spectrum and Stargate rather than between Spectrum and Stargate. This proposed change was rejected by Woodruff. Thereafter, the Plaintiffs' delivered the Purchase Agreement to the Defendants.  The Purchase Agreement provides that Stargate will purchase "all of the stock, assets and business or product lines ... owned and conducted by Spectrum" for $1,008,000.00 in the form of shares of Stargate stock which is valued at $30.00 per share.  The sellers would be free to sell the Stargate stock five years from the date of the purchase agreement and the buyer guarantees the price of the stock will be in excess of $30.00 at that time. (PX O) The Purchase Agreement also provides that  it is the Buyer's intention to provide employees of Stargate with benefits which are substantially similar to the benefits currently provided to the employees of Spectrum.  Murphy testified that they wanted to sell Spectrum because

Mr. Murphy and Mr. Smith wanted to retire and they wanted to provide continuing employment for Spectrum's employees.

51. The products which Mr. Woodruff represented were in production or ready for delivery, including the SG-1 detector were never even close to production or manufacture, but rather were still in the early stages of research and development.

52. The mouse-trap device was never a product in which Stargate or its predecessors had any development rights or production contracts. There never was a government contract for 30 Million Dollars. The contracts with Draeger were in reality nothing more than initial discussions. There was no factual basis for a claim that the corporation might have 10 million in sales prior to November 2005 of the SG-1 units or any other product owned by Stargate.

53. At the time that Mr. Murphy and Mr. Smith were issued certificates for shares in Stargate in March of 2005, there was no such corporation within the records of either Delaware or Ohio, or anywhere else in the country. At the time of the issuance of the Stargate stock certificates, the Certificate of Incorporation of Q Electronics Corporation had been cancelled by the state of Delaware on March 1, 2002. On September 29, 2005, twenty three (23) days after this lawsuit had been filed, and after it was demanded of Defendants to produce proof of the Stargate Defense Systems Corporation's corporate status, the Defendants filed with the state of Delaware two amendments with the cancelled corporation, Q Electronics Corporation, 1) calling for a reinstatement of Q Electronics Corporation's Corporate Charter, and 2) changing the name of Q Electronics Corporation to Stargate Defense Systems Corporation.

54. At the time of the purchase and subsequent issuance of Stargate Defense Systems

Corporation stock, the Defendants knew, but did not disclose that Stargate was disqualified from

holding a government contract by reason of the fact that its principal representative and identified

researcher along with its Military Systems Director and substitute representative were

both under Indictment in the United States District Court for the Eastern District of Virginia for

conspiracy to commit mail/wire fraud among other crimes.  The Defendants further knew that Stargate

had on November 3, 2004 sent an FAR 52.209-5 certification to the United States Army contracting

officer which certified that the principals of Stargate were not under indictment and had no convictions

within 3 years of the date of the contract proposal. (PX 82) Nor had the

Defendants disclosed Mr. Ross' prior conviction.

55. Mr. Woodruff and Mr. Ross also failed to disclose that while the $12,000 payment made

by Mr. Murphy on January 25, 2002 was apparently used for corporate expenses, the $20,000

payment made by Mr. Murphy on February 4, 2002 was diverted and taken back out of the Q Corp

account on the same day on which it was deposited.

56. Mr. Woodruff and Mr. Ross also failed to disclose that Mr. Woodruff and Carl Viviani, the

other major shareholder of the corporation were claiming to have a lien on all assets of the Corporation.

This lien claim was not disclosed in the financial statements or Prospectus provided to the Plaintiffs and

was not discovered by them until they were provided a copy

of Mr. Woodruff and Mr. Viviani's letter of April 25, 2005.

57. On March 21, 2005, the Defendants caused the issuance of Certificate No. 46 representing

ownership of 16,800 shares of Stargate Defense System Corporation stock by

John Murphy (PX 88) and Certificate No. 47 representing ownership of 16,800 shares of Stargate

-17-

Defense System Corporation stock by James Smith (PX 89). Even though the two

previous Certificates were issued to the Plaintiffs only five days earlier, they were issued on different

certificate forms. Certificates No. 46 and 47 do not identify the corporation as

a Delaware corporation and correctly state that Stargate is only authorized to issue 1,000,000 shares.

58. On April 13, 2005, the United States Army issued a "Cure Notice" . This notice cited as a

material default the false statements Mr. Woodruff had made on behalf of Stargate in the FAR 52.209-

5 Certification representing that none of the principals or officers of Stargate were under criminal

indictment or had been convicted of criminal conduct. The Cure Notice identified the pre-existing

indictment of Mr. Woodruff and Scott Faehner, who was identified in the Cure

Notice as the Military Systems Director of Stargate, as material misrepresentations under the contract

and grounds for termination.

59. On May 4, 2005, the United States Army terminated their contract with Stargate Defense

Systems Corporation because the cure of the breach of contract proposed by Stargate that Mr.

Woodruff would resign from the company and be replaced by Mr. Ross was unacceptable.  As the

Army apparently deduced, the representation that Mr. Woodruff would resign was insufficient because

Mr. Woodruff's actions indicated that he retained control of Stargate as shown by an April 25, 2005

letter to shareholders which clearly indicated that despite his resignation Mr. Woodruff would remain in

control of the corporation.  The US Army determined that Mr. Woodruff's alleged resignation was not

a relinquishment of control as he continued to contact US Army representatives after his alleged

resignation. The United States Army further found that Stargate's attempt to use Mr. Ross as the

company president and responsible officer was not an acceptable replacement for Mr. Woodruff as

-18-

President of Stargate Defense Systems Corporation because Mr. Ross had been convicted of making

false statements to a government agency.

60. Despite the inconsistencies in the stock certificates, various representations about products

and acquisitions, learning of the lien held by Mr. Viviani, loss of the US Army contract and the

sentencing of Mr. Woodruff, Plaintiffs  assert it was not until after the middle of June, 2005 that they

began to suspect a fraud had been perpetrated upon them because the Defendants isolated the Plaintiffs

and their former employees from the corporate records and the operations of Stargate. Plaintiffs also

became aware of a serious arrearage in rent, and cancellations of credit with Spectrum's main supplier,

including the H Lef Company for which Spectrum relies on for fuses and other parts for the Sierra

Pacific Power job. Despite their concern over Defendants' operation of Spectrum, Plaintiffs did not

seek immediate rescission of the Stargate/Spectrum deal.  Defendant Ross asked Smith in early June,

2005, if in light of the cancellation of the army contract and Woodruff's sentencing, if Plaintiffs wanted

to rescind the sale of Spectrum to Stargate.  Mr. Smith told Mr. Ross that he didn't want to rescind but

that he would talk to Mr. Murphy.  A few days later Mr. Murphy sent Mr. Woodruff a letter in which

he stated that "in answer to apparent speculation that there may be an effort by original Spectrum

Infrared owners to reverse the acquisition of Spectrum Infrared by Stargate, I am not aware of any

such effort and have no plans to enter into such an effort."

61. Mr. Smith, on behalf of Spectrum, had prior to March 17, 2005 substantially prepared a

bid on a large job to Sierra Pacific Power. He continued to work with the customer after March 17,

2005 to finalize Spectrum's bid proposal, the final technical specifications, and the final contract

documents. (PX 90) The bid was finally submitted on April 11, 2005 and the purchase order from

Sierra Pacific Power in the amount of $649,238 was dated June 15, 2005.  Although no Stargate

employee played any significant role in obtaining this contract, the final contract documents were

eventually signed by Mr. Woodruff on behalf of Spectrum as the contract was not awarded until after

the sale of Spectrum to Stargate.

62. Since the time that Stargate has taken over operations of Spectrum, Spectrum has received

notice of the cancellation of its insurance coverage through AICCO for nonpayment

of the agreed upon premium. (PX 91) Spectrum has received a demand letter from its landlord stating

that it was (as of June 9) two months in arrears and in default for not

providing an insurance certificate. (PX 92, 93) On September 13, 2005, Spectrum received a notice of

the failure to file payroll reports with the Ohio Department of Jobs and Family

Services for the second quarter of 2005. (PX 94) Stargate has started to run its payroll through

Spectrum because Stargate has no money coming in and its bank account balances are

negative. Stargate used $20,000 of Spectrum funds to pay the legal defense costs of Stargate, Mr.

Ross and Mr. Woodruff in this case even though Spectrum was identified as only a nominal

party. Stargate transferred an additional $5,000 of Spectrum funds with no identification of its purpose.

(PX 95) Suppliers who are necessary to the operation of Spectrum's business have

indicated that they are past due and have threatened cut-off of critical supplies.

63. Local phone calls, local fax transmissions and local cell phone calls all utilized the facilities

of interstate commerce even when the calls are intrastate calls. The same

lines and facilities handle both local and interstate calls and cell phone calls are routinely routed to an

out of state switching station as part of the process.

64.  Plaintiffs requested rescission of the stock sales on August 3, 2005.  The Plaintiffs tendered their share certificates into the court in connection with their rescission claim.

## ANALYSIS AND CONCLUSIONS OF LAW

Plaintiffs have asserted both State and Federal securities law claims as well as a fraud claim under Ohio law. The Court will address the State law statutory claims first.

## I.  STATE LAW STATUTORY CLAIMS

Plaintiffs assert that Defendants have violated three provisions of Ohio Rev. Code §1707.44, specifically, §1707.44(B)(4), (C)(1) and (D) and thus, Plaintiffs are entitled to rescission of all three stock transactions under §1707.43.

Section 1707.44(B)(4) provides:

> (B)  No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:
> * * *
> (4) Selling any securities in this state;

Section 1707.44(C)(1) provides:

> (C) No person shall knowingly sell, cause to be sold, offer for sale, or cause to be offered for sale, any security which comes under any of the following descriptions;
> (1) Is not exempt under section 1707.02 of the Revised Code, nor the subject matter of one of the transactions exempted in section 1707.03, 1707.04, or 1707.34 of the Revised Code, has not been registered by coordination or qualification, and is not the subject matter of a transaction that has been registered by description;

Section 1707.44(D) provides:

> (D) No person who is an officer, director, or trustee of, or a

-21-

dealer for, any issuer, and who knows such issuer to be insolvent in that the liabilities of the issuer exceed its assets, shall sell any securities of or for any such issuer, without disclosing the fact of the insolvency to the purchaser.

Section 1707.43 provides in relevant part:

(A) Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707, of the Revised Code, is voidable at the election of the purchaser.  The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

The Court will examine Plaintiffs' claims under these sections with respect to the first two stock transactions at issue[1].  The March 18, 2005 transaction must be excluded from Plaintiffs' claims under the Ohio blue sky law because Plaintiffs were the sellers in the last transaction and the Ohio blue sky law does not provide a remedy for defrauded sellers.

## A. §1707.44(B)(4)

To demonstrate a claim under R.C. §1707.44(B)(4), Plaintiffs must prove the following

---

[1]While neither party has addressed this issue, the Court's research indicates that Ohio's blue sky law provides a remedy only for a defrauded purchaser, not for a defrauded seller.  In this case, Plaintiffs were purchasers in the first two stock purchases on January 25, 2002 and February 4, 2002.  Plaintiffs were the sellers in the stock for stock transaction on March 18, 2005.  Accordingly, their only recourse as defrauded sellers in the March 18, 2005 transaction is their federal cause of action under 10b-5 and their state law claim for common law fraud.  *See Koehler Management Corp. v. McIntyre*, 541 F.2d 611, 616 (6th Cir. 1976) cert. denied 429 U.S. 1074 (1977).

-22-

elements: (1) Defendants acted knowingly; (2) in making or causing to be made a false representation, either orally or in writing; (3) concerning a material and relevant fact; (4) for the purpose of selling a security in this state.  The Ohio Supreme Court has confirmed that §1707.44(B)(4)  prohibits only affirmative misrepresentations and does not apply to fraudulent nondisclosure.  *State v. Warner*, 55 Ohio St.3d 31, 564 N.E.2d 18 (Syllabus 2, 1990).  Unlike claims under 10b-5 and common law fraud, a plaintiff need not prove justifiable reliance on a seller's misrepresentations under the Ohio blue sky law in order to rescind the purchase. *See Koehler Management Corp*., 541 F.2d at 616.

### 1.  January 25, 2002 stock purchase

Plaintiffs Murphy and Smith paid $12,000 for 400 shares of Q Corporation stock as evidenced in Plaintiff's Ex. 16.  Mr. Murphy testified that in making this purchase he relied upon the following representations by James Woodruff:

On January 3, 2002 Mr. Woodruff represented to Murphy and Smith:

1. There would be a secondary offering of Q Corp stock which would take place around March of 2002, which would also involve a reverse split. Later on January 22, 2002 and again on January 25, 2002, Woodruff expressly represented to Mr. Murphy that Q Corp was about to "go public" in October of 2002. (Murphy testimony, transcript at pages 266-267, 268 Plaintiff's Exhibits 15 and 17) Mr. Woodruff testified in his direct examination (Woodruff transcript) as follows on this point:

Page 13

16      Did you make any representations to
17      Mr. Smith about Q Corporation going public?
18      A      No. I think he's confusing raising

-23-

19    money with going public. We were planning to do

20    a limited offering in the state. You can -- you

21    can have up to fifty unqualified and as many

22    qualified investors as meet the criteria, and we

23    had planned to do a fund raising to raise some

24    money; but it was not in the form of a public

Page 14

1    offering in the true sense.

2    Q      Okay. Did that ever occur?

3    A      No.

4    Q      Why not?

5    A      When the Federal Government -- we

6    were -- we were buying out a shareholder, a

7    gentleman by the name of Robert Jordan; and when

8    the Federal Government came in and raided our

9    offices and took all of our computers and so

10    forth, and we became aware of the problem that

11    existed as a result of Bob Jordan, we held all of

12    that in abeyance.

13    We closed the Washington office, I

14    moved to Ohio, and I operated out of the Eastlake

15    facility. We kind of had to re-trench as a

16    company.

17    Q      Okay. The next allegation they make

18    is that during a phone call on December 28th,

19    2001, you represented to Mr. Murphy that

20    Q Corporation was going to market with a

21    secondary stock offering in March with the

22    contemplation of a reverse split.

23    Do you recall talking about those

24    type of specific terms?

Page 15

1    A      We -- at one time we -- we had

2    entered into discussions with a gentleman

3    regarding the possibility of merging into a

4    public -- an existing public entity. They were

5    just discussions that never got past that point.

```
6       However, the phrase "stock split" -- we did, in
7       fact, take the number of shares and double them;
8       but it was a private company, so all we did was
9       file with the state to increase the total number
10      of shares.
```

While Mr. Woodruff denies making any statements about "going public" to Plaintiffs, the contemporaneous articles /advertisements in the Akron Business News, which were written by Mr. Woodruff and published in the Akron Business News, all refer to Q Corp going public or to Initial Public Offerings. (Plaintiffs' Exhibits 53 and 56, Woodruff transcript at 129-130) Mr. Woodruff claims that he decided to put his plans for a limited private offering on hold because of the FBI raid of his office in Virginia. (Woodruff transcript at page 14) The FBI raid occurred in February of 2001, long before this representation was made to Murphy and Smith. (Woodruff transcript at page 210) Woodruff knew that the statements about the timing of the company "going public" were impossible to meet. He acknowledged that between audits, financials, due diligence, and legal and accounting requirements implementation of a public offering could take years. (Woodruff transcript at 129).

Later Mr. Woodruff testified that the final decision not to go public was made only a week or two before the Spectrum purchase in March of 2005. (Woodruff transcript at 191-192). He claimed that the decision at that time was based upon the great interest in the companies' products (Id.), but admitted that in any public offering he would have to disclose the fact of his conviction and the problems with the US Army contract. (Woodruff transcript at 189-190). Thus, the evidence supports a finding that Mr. Woodruff knowingly made false representations in January of 2002 about Q Corp being in a position to go public in March of 2002 when he had put

-25-

those plans on hold in 2001 at the time of the FBI raid and had not done any of the preparation necessary to even start the process of a public offering. (Woodruff transcript at 183-188).

2. Mr. Woodruff also represented on January 3, 2002, that (Q Corp) had bought a Cleveland manufacturer of electric heaters, and that manufacturer has about 60 percent Government business. This manufacturer makes tent heaters for Hunter Manufacturing of Solon, Ohio. It also has metal fabrication capability. He could market Spectrum products through Hunter to the Government. Mr. Woodruff denied making this statement, yet John Murphy's contemporaneous notes refute this denial. Mr. Woodruff also admitted that this statement is not true. (Woodruff transcript at 15-16).

3. Mr. Woodruff represented that Q Corp was currently buying a one and a half million dollar business. Mr. Woodruff denies making this statement and doesn't remember any such business. (Woodruff transcript at 16-17). On January 4, 2002, Mr. Woodruff (in the presence of Mr. Mitchell) represented in person to Mr. Murphy and Mr. Smith that he (Q Corp) was buying or had bought Panelbloc, which was a gas infrared manufacturer, having business of $400,000 per year. (Murphy testimony, transcript at 263-264). Ray Gotliebowski testified that he was the owner of NuFab and Panelbloc. He testified that the first discussions with Mr. Woodruff about NuFab (not Panelbloc) ended at the end of 2001. (Transcript at page 47) He said that the discussions about Panelbloc first occurred in 2005. (Id.) Thus as of the time that this representation was made the discussions about NuFab had ended and there had never been any discussions about Panelbloc. It should be noted that in late February, 2002, when Mr. Woodruff presented to the Plaintiffs the "Prospectus" for Q Corporation, that document still listed NuFab as "to be acquired" when the evidence before the court establishes that the discussions had ended in 2001.

-26-

4. On January 24, 2002, Mr. Woodruff represented to Smith, Murphy and Leslie Atkinson that Q Corp has a net worth of three and a half million dollars with combined operations, apparently at more than one location, which had about 50 people including two Ph.D.'s. (Murphy testimony, transcript at pages 267-268). Mr. Woodruff admited that the Ph.D.'s did not come on board until 2004 and that the company never had 50 employees. (Woodruff transcript at page 23) With respect to claim of net worth of 3.5 Million dollars in the 2002 time frame, Mr. Ross, the Chief Financial Officer, testified that this was not a correct number. (Transcript at 160-161) Mr. Woodruff testified that the primary asset of the company was the patent. (Woodruff transcript at 23, 205). However, in his deposition testimony, Mr. Woodruff testified that the asset list attached to Plaintiff's Exhibits 27, 28, and 29 were the sole assets of those corporations at that time (July of 2001) and that they were subject to a lien of Carl Viviani. (Woodruff transcript at 150-154) Mr. Woodruff testified that a lot of the assets purchased by the corporation were done through loans from Carl Viviani. (Id. at 156) Mr. Woodruff testified that 5-6 months after 9/11/2001, Carl Viviani had loaned the money to the corporation to buy out Fed Credit, Robert Jordan, and numerous other shareholders. (Id. at 141) Mr. Ross testified that the amount owed to Mr. Viviani in 2002 was a substantial amount of money. (Transcript at pages 155) A substantial amount of the equipment of the corporation had been seized by the FBI in February of 2001. (Woodruff transcript at page 186) Mr. Viviani loaned the money to get this equipment back from Jordan. (Id.) With respect to the patent, Mr. Woodruff testified:

> Page 202
> 23    Q.    And does Stargate Defense Systems
> 24        Corporation own that patent?
>
> Page 203

```
1      A.      Yeah, it was transferred on -- when
2   I did the original application for the patent, it
3   had the assignment done to Interwoven. When
4   we -- when we ran into the dispute with Bob
5   Jordan, to protect ourselves we dropped that for
6    a period of time; the patent hadn't yet issued,
7   okay, but we dropped that. And when the company
8   became Q Corporation, I went ahead and re-did it
9   in Q Corporation's name and it was granted.
```

Thus, it is not even clear that the patent was in the corporation's name at the time of this misrepresentation. This is significant because the evidence also shows that the decision was not made until June of 2004 that the patent and related technology should remain in the corporations' name. (See Plaintiff's Exhibit 114).

These were the representations made in connection with the January 25, 2002 stock purchase. Plaintiffs testified that these representations were made to them and that the information conveyed to them was important to them in making their decision to purchase the stock. Based upon the evidence submitted at trial and the Court's analysis of the credibility of the witnesses, the Court finds that these representations were false and that Mr. Woodruff knew that they were false at the time that they were made.[2] Further, the Court finds that the false representations were material and were made for the purpose of selling shares of Q Corp stock to Plaintiffs. Accordingly, Defendants' conduct violated R.C. §1707.44(B)(4).

_____

[2]Mr. Woodruff's answer to most of these false representation claims is that he never made the specific statement or that Plaintiffs misunderstood his comments.  It is clear from Mr. Woodruff's testimony that he was always working on some project or acquisition. It was the impression of this Court that Mr. Woodruff could not keep track of all the stories he told or the "acquisitions" or "deals" he was pursuing.  Accordingly, the Court has accepted Plaintiff's accounts of the conversations between the parties, particularly if they are backed up with contemporaneous notes or writings.

### 2.  February 4, 2002 stock purchase

John Murphy made a separate purchase of Q Corp stock less than two weeks later, on February 4, 2002, as evidenced by his check in the amount of $20,000 (Plaintiff's Exhibit 26). On January 31, 2002, prior to the second stock sale, Mr. Woodruff represented to Mr.Murphy that he could buy additional shares of Q Corp stock at a special price less than the $30 which was the price which had historically been charged for this stock because Woodruff was arranging for this sale from another shareholder under distressed circumstances. Mr. Woodruff testified:

> Page 21
>
> 15    A. What had happened is one of our key
> 16    employees, a gentleman that I've known for many
> 17    years, Wilmer Fitzgerald, passed away; and he had
> 18    been an insider from the beginning of the time
> 19    the company started, and his shares then would be
> 20    available. And because the price was less than
> 21    that of what someone from the outside would pay
> 22     for those shares, I attempted to arrange a sale
> 23    between Mr. Murphy and Mr. Fitzgerald's widow.
> 24    And she asked me that -- could I
>
> Page 22
>
> 1    just deal with those shares which he had earned
> 2    and not yet been issued first, and I said okay.
> 3    And we sold those shares to John; and then, you
> 4     know, which went towards the -- you know, the
> 5    money that we owed Fitz for his time and efforts."

The true circumstances were that Mr.Woodruff was under investigation by the FBI and in order to get the equipment back and clarify control of the corporation he was borrowing money from Carl Viviani to repurchase stock from dissenting shareholders. (Woodruff transcript at

-29-

page 141).   An examination of the Board of Directors' minutes marked as Plaintiffs' Exhibit 113

makes it clear that Mr. Fitzgerald's death was sometime later.   In addition, the false representations

made before the first stock sale on January 25, 2002, were also considered by Mr. Murphy when this

stock purchase was made on February 4, 2002.  The Court finds that Defendants have violated

§1707.44(B)(4) with respect to the February 4, 2002 stock sale to Mr. Murphy.

## B.  §1707.44(D)

Plaintiffs also claim that Defendants violated §1707.44(D) with respect to the first two

transactions.  Section 1707.44(D) provides:

> (D) No person who is an officer, director, or trustee of, or a dealer for, any issuer, and
> who knows such issuer to be insolvent in that the liabilities of the issuer exceed its
> assets, shall sell any securities of or for any such issuer, without disclosing the fact of the
> insolvency to the purchaser.

For purposes of this section, a company is insolvent when it is unable to pay its obligations as

they become due in the usual course of its affairs. §1707.01(O).  Both Mr. Woodruff and Mr. Ross

were officers and directors of Stargate and or Q Corp at the time of the first two transactions.  Both

were in a position to know the assets and liabilities of Stargate.  Mr. Ross was treasurer of Stargate

before he became president when Mr. Woodruff was forced to step down after pleading guilty to wire

fraud in federal court.  In these transactions the sale was made by Mr. Woodruff.

Both of these transactions occurred without a disclosure that Carl Viviani had liens and notes

from Stargate and its predecessors in excess of $900,000.  There was evidence that Stargate and its

predecessors had cash flow problems.  Mr. Woodruff admitted that the company had cash flow

problems and testified that Mr. Viviani loaned money to the company on several occasions to keep the

company afloat, although Plaintiffs were unaware of that fact.  There was evidence submitted at trial showing that Stargate's liabilities exceeded its assets on the dates of the first two transactions, excluding the value of Woodruff's patent and sufficient evidence presented to conclude that Stargate was unable to pay its obligations as they became due in the usual course of its affairs.  Plaintiffs met their burden of showing that Stargate was insolvent at the time of the 2002 transactions, and are entitled to judgment on their claim under §1707.44(D) as to the January 26, 2002 and February 4, 2002 transactions.

**C.  §1707.44(C)(1)**

Plaintiffs assert that Defendants never registered the securities they sold to Plaintiffs in violation of §1707.44(C)(1).  Section 1707.44(C)(1) provides that no person shall knowingly sell, cause to be sold, or offer for sale, or cause to be offered for sale, any security which is not subject to one of the transaction exemptions contained in Ohio Revised Code Chapter 1707.  Defendants admit that they did not register the securities they sold but contend that the transactions are exempt under §1707.03(O)(1).  The burden of proof that a security is exempt from registration rests upon the Defendants.  See §1707.45.

Defendants contend that §1707.03(O)(1) provides an exemption for the March 18, 2005 transaction.  They did not address the first two transactions.  The Court will review whether the first two transactions are exempt under §1707.03(O)(1) which provides:

> (O)(1) The sale of any equity security is exempt if all of the following conditions are satisfied:
>
> (a) The sale is by the issuer of the security.
> (b) The total number of purchasers in this state of all securities issued or sold by the issuer or are in reliance upon this exemption during the period of one year ending with the date of this sale does not exceed

ten. A sale of securities registered under this Chapter are sold
pursuant to this exemption under this Chapter other than this
exemption shall not be integrated with a sale pursuant to this
exemption and computing the number of purchasers under this
exemption.

(c) No advertisement, article, notice, or other communication published
in any newspaper, magazine, or similar medium or broadcast over
television or radio is used in connection with the sale, but the use of
an offering circular or other communication delivered by the issuer to
selected individuals does not destroy this exemption.

(d) The issuer reasonably believes after reasonable investigation that the
purchaser is purchasing for investment.

(e) The aggregate commission, discount, and other remuneration,
excluding legal, accounting and printing fees, paid or given directly or
indirectly does not exceed ten percent of the initial offering price.

(f) Any such commission, discount, or other remuneration for sales in this state
is paid or given only to dealers or sales person registered pursuant to this
Chapter.

Ohio Revised Code §1707.03(O)(1). Review of the evidence demonstrates that these conditions are

satisfied for the January 25, 2002 transaction. The stock was being sold by Stargate itself. The total

number of purchasers of stock in the last year was less than ten. Defendants were not advertising the

sale of this stock. The Plaintiffs were purchasing for an investment. There was no commission paid with

respect to the sale of this stock. Inasmuch the January 25, 2002 transactions was exempt, Ohio

Revised Code §1707.44(C)(1) was not violated.

These conditions were not all satisfied with respect to the February 4, 2002 transaction

however. In that transaction Mr. Woodruff was allegedly working as a broker for the widow of

Wilmer Fitzgerald, thus the sale was not by the issuer of the security. Accordingly, this transaction was

not exempt and violated §1707.44(C)(1).

As Plaintiffs have demonstrated that the Defendants violated §1707.44(B)(4) and (D) with

-32-

respect to the first two transactions and §1707.44(C)(1) with respect to the February 4, 2002

transaction, both transactions are voidable under §1707.43.

Section 1707.43 provides in relevant part:

>(A) Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707, of the Revised Code, is voidable at the election of the purchaser.  The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

The Plaintiffs have elected to void the transactions and tendered their shares to Defendants on

the first day of trial.  The purchaser of a security sold in violation of any provision in RC Chapter 1707

is entitled to restitution of his purchase price unless the violation is of such a trivial nature as not to

materially affect the protection contemplated by the violated provision.  *Bronaugh v. R & E Dredging*

*Co.*, 16 Ohio St.2d 35, 242 N.E.2d 572 (1968).  Defendants have made no showing that the violations

were trivial in nature or did not materially affect the protection contemplated by the violated provisions.

The purpose of §1707.44(B)(4), §1707.44(C)(1) and §1707.44(D) is to protect purchasers from the

conduct undertaken by Defendants in this case.  Accordingly, the Court finds that the violations

materially affected the protection contemplated by the violated provisions.[3]  Under §1707.43 Plaintiffs

are entitled to the return of the purchase price of their first two transactions, $12,000 and $20,000,

---

[3]While neither party has mentioned the statute of limitations provision of §1707.43(B), the Court finds that the Plaintiffs did not know or have reason to know of the violations of Chapter 1707 until after the third transaction on March 18, 2005 and that rescission was sought within two years of discovering the fraud and not more than five years from the dates of the sales.

respectively, for a total of $32,000.

## II.  FRAUD UNDER FEDERAL SECURITIES LAW AND OHIO COMMON LAW

Plaintiffs' assert that Defendants made fraudulent representations and/or omitted material facts

with the intent of defrauding Plaintiffs in violation of 15 U.S.C. §78j(b) and 78t(a).

15 U.S.C. §78j(b) provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or
> instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange - -
>
>            * * *
>
> (b) To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security not
> so registered, or any securities based swap agreement . . . any
> manipulative or deceptive device or contrivants in contravention of
> such rules and regulations as the commission may prescribe as
> necessary or appropriate in the public interest or for the protection of
> investors.

15 U.S.C. §78j(b). The potential liability of the individuals who control Stargate arises out of 15

U.S.C. §78t(a), which provides as follows:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or any rule or regulation thereunder shall also be liable jointly
> and severally with and to the same extent that such a controlled person to any person to
> whom such a controlled person is liable, unless the controlling person acted in good
> faith and did not directly or indirectly induce the act or acts constituting the violation or
> cause of action.

15 U.S.C. §78t(a).

Rule 10b-5 of the Securities and Exchange Commission, promulgated under § 10(b) of the

Securities Exchange Act of 1934 (Act), prohibits the making of any untrue statement of a material fact

or the omission of a material fact in connection with the purchase or sale of any security. *Basic, Inc. v.*

*Levinson*, 485 U.S. 224, 231-232 (1988).  In order for a plaintiff to prevail on a Rule 10b-5 claim, the

plaintiff must establish five elements: 1) a misrepresentation or omission; 2) of a material fact; 3) made

with scienter; 4) justifiably relied on by plaintiffs, and 5) proximately causing them injury.  *Helwig v.*

*Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001).

The elements of common law fraud under Ohio law are substantially similar.  To prevail on a

claim of common law fraud, a plaintiff must prove: 1) a representation or, where there is a duty to

disclose, concealment of a fact; 2) which is material to the transaction at hand; 3) made with knowledge

of its falsity, or with such utter disregard and recklessness as to its truth or falsity that knowledge may

be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the

representation or concealment, and 6) a resulting injury proximately caused by the reliance.  *Glassner*

*v. R.J. Reynolds Tobacco Co.*, 222 F.3d 343, 352 (6th Cir. 2000), *citing Burr v. Board of County*

*Comm'rs of Stark Co.*, 491 N.E.2d 1101, 1105 (Ohio 1986).

### 1.  Misrepresentation or Omission

The Court must first ascertain whether statements made by Defendants were false.  *Sinay v.*

*Lamson & Sessions Company*, 948 F.2d 1037, 1040 (6th Cir. 1991).  "Silence, absent a duty to

disclose, is not misleading under Rule 10b-5."  *In re Ford Motor Co. Securities Litigtion*, 381 F.3d

563 (6th Cir. 2004), citing *Basic*, 485 U.S. 224, 239 n.17.  However, a party who discloses material

facts in connection with securities transactions "assumes[s] a duty to speak fully and truthfully on those

subjects." *Rubin v. Schottenstein*, 143 F. 3d 263, 268 (6th Cir. 1998).

In determining whether particular statements are actionable, the Court must scrutinize the

nature of the statement to determine whether the statement was false when made. *Sinay,* 948 F. 2d at

1040.  While many of the statements made by Mr. Woodruff to Plaintiffs concerned actions that Q Corporation or Stargate would be taking in the future, or were about to undertake, Plaintiffs introduced evidence demonstrating that many of these representations were false when they were made.  Some of these representations, relevant to the first two stock purchases, along with the evidence that they were false, have been set forth in the state claims section above.  The Court finds that the following statements are also false for the purposes of Plaintiffs' 10b-5 and common law fraud claims:

1. Mr. Woodruff made representations in January of 2002 about Q Corporation being in a position to go public in March of 2002 when he had put those plans on hold in 2001 at the time of the FBI raid and had not done any of the preparation necessary to even start the process of a public offering.

2. Mr. Woodruff also represented on January 3, 2002, that (Q Corp) had bought a Cleveland manufacturer of electric heaters, and that manufacturer has about 60 percent Government business. This manufacturer makes tent heaters for Hunter Manufacturing of Solon, Ohio. It also has metal fabrication capability. He could market Spectrum products through Hunter to the Government. Mr. Woodruff denied making this statement but admitted that the statement would not be true. (Woodruff transcript at 15-16).

3. On January 4, 2002, Mr. Woodruff (in the presence of Mr. Mitchell) represented in person to Mr.  Murphy and Mr. Smith that he (Q Corp) was buying or had bought Panelbloc, which was a gas infrared manufacturer, having business of $400,000 per year. (Murphy testimony, transcript at 263-264). Ray Gotliebowski testified that he was the owner of NuFab and Panelbloc. He testified that the first discussions with Woodruff about NuFab (not Panelbloc) ended at the end of 2001. (Transcript at

page 47) He said that the discussions about Panelbloc first occurred in 2005. (Id.) Thus as of the time that this representation was made the discussions about NuFab had ended and there had never been any discussions about Panelbloc. In late February, 2002, when Mr. Woodruff presented to the Plaintiffs the "Prospectus" for Q Corporation, that document still listed NuFab as "to be acquired" when the evidence before the court establishes that the discussions had ended in 2001.

4. On January 24, 2002, Mr. Woodruff represented to Smith, Murphy and Leslie Atkinson that Q Corporation has a net worth of three and a half million dollars with combined operations, apparently at more than one location, which had about 50 people including two Ph.D.'s. (Murphy testimony, transcript at pages 267-268). Woodruff admits that the Ph.D.'s did not come on board until 2004 and that the company never had 50 employees. (Woodruff transcript at page 23) With respect to claim of net worth of 3.5 Million dollars in the 2002 time frame, Mr. Ross, the Chief Financial Officer, testified that this was not a correct number. (Transcript at 160-161) .

With respect to the March 18, 2005, stock for stock transaction, Plaintiffs assert that they relied on the following representations:

Plaintiffs signed the Purchase Agreement on March 18, 2005 in which Stargate agreed to purchase "all of the stock, assets and business or product lines ... owned and conducted by Spectrum" for $1,008,000.00 in the form of shares of Stargate stock which is valued at $30.00 per share. Plaintiffs contend that Defendants fed carefully orchestrated information to them over the three year period between the 2002 stock purchases and the March 2005 transaction to create an illusion about the nature and products of Q Corporation/Stargate Defense Systems Corporation.

Specifically, Plaintiffs were given a document titled a "Product Perspective" which purported to

summarize Q Corporation's products.  (Pl. Ex. 53).  Mr. Murphy thought that this document gave the impression that the products were market ready.  Mr. Murphy stated that this impression was strengthened by a series of newspaper articles, which noted that Q Corp's business had never been better because their product mix had a heavy focus on security and components for security systems. The last news article quotes Woodruff stating "Our government business went from zero to a million dollars almost overnight." (Pl. Ex. 53).  Mr. Woodruff testified that the news articles were "press" and he was not responsible for them.  While Mr. Woodruff asserted that the "press" was written by the newspapers in which the articles appeared, Mr. Baker, the publisher of Akron Life & Leisure, testified that some articles were submitted to Woodruff for approval.  Mr. Woodruff acknowledged that there were misrepresentations in the articles but contended that no one would believe "press".  Nevertheless, Mr. Woodruff gave the articles to Plaintiffs in what can only be presumed to be an effort to impress them and convince them of his corporate abilities and the value of his company and its products.

Plaintiffs were provided with a Q Corporation pro forma which projected  1.5 million dollars of sales for "electronics" with a supporting note that "sales have risen throughout last year. Sales calls are being made regularly and new customers added."   The pro forma also projects another $500,000 in sales through Mitchco and an additional 1.75 million in sales through the acquisition of Copper Foil, Delta Lighting and Spectrum.

On or about November 12, 2003, Mr. Woodruff told Mr. Murphy that a contract had been passed for $1.75 million, and he (Q Corp) can now ship this product. The product would be produced at $900 per unit, and each unit would sell for $3,400, and he hopes to get a big order soon of $30 million. Mr. Woodruff also told Mr. Murphy that he has money available from the State of Ohio and

that he is going to use the State money to follow through on the acquisitions of Spectrum Infrared and Panelbloc and he was proceeding to manufacture security devices. (Murphy testimony, transcript at page 298-299)

However, on January 26, 2004, Mr. Murphy was told by Mr. Ross that the Panelbloc deal had fallen through but that they were pursuing a replacement acquisition.  In that same conversation, Mr. Ross represented to Mr. Murphy that "they had a handheld SG-1 detector order finalized and was going to go for 30 percent down, 33 percent down, upon receiving the order."

On March 17, 2004, Mr. Woodruff told Mr. Murphy that "they (Stargate) had orders for an additional 200 to 230 units. He wasn't really specific on which unit, but that they had one order for Spain -- let me see here -- that Stargate at the time, I guess it was at this time, had on hand or goods on order sufficient to make 500 units. The programming, which apparently was an issue in the past, had been done and had been done for $45,000. He also said that the unit takes about two hours to assemble, and so it was very easy to manufacture."

On or about July 6, 2004, Mr. Woodruff stated that they were starting on their government contract on July 15, 2004. (Plaintiff's Exhibit 71, transcript at page 303). On December 6, 2004, Woodruff stated to Mr. Murphy that today was the first day of "deliverables" under the government contract and that they were in process of billing the government. (Plaintiff's Exhibit 73, transcript at page 305-306).  Shortly thereafter, the Plaintiffs were presented with a Project Management Plan which documented the existence of a 1.27 million dollar government contract between the United States Army and Stargate Defense Systems Corporation. (Plaintiff's Exhibit 74, transcript at page 309-310) Mr. Murphy said the Project Management Plan lead the Plaintiffs to give credibility to the other

statements of the Defendants. (Id.) At this point in time the parties started talking a stock only deal. (Woodruff transcript at 72-73).

On February 7, 2005, Mr. Woodruff called Mr. Murphy and drew his attention to an upcoming full page article on Stargate Defense Systems Corporation in the Akron Beacon Journal. He also stated that they were working with Draeger, a German corporation and expected to have 10 million in business by November of 2005. (Plaintiff's Exhibit 75, transcript at page 317-319).

On February 21, 2005, Mr. Woodruff called Mr. Murphy's attention to a favorable newspaper article in Crains Cleveland Business about Stargate. (Plaintiff's Exhibit 76, transcript at page 321).

On March 16, 2005, the Plaintiffs received their shares in Stargate Defense Systems Corporation to complete their 2002 purchase transactions. (Plaintiff's Exhibits 77 and 78, transcript at page 323). On March 17, 2005, the Plaintiffs received a signed purchase agreement. (Plaintiff's Exhibit 80).  Before delivering this executed document back to Mr. Woodruff, John Murphy took it for review and comment to a lawyer from Benesch, Friedlander, Coplan & Arnoff. Any review by the lawyer was extremely limited.  He also reviewed the updated five month Profit & Loss Statement provided by Mr. Woodruff and prepared by Mr. Ross.  Mr. Murphy thought that the Profit & Loss Statement presented a picture which was consistent with the prior representations. Over a period of 137 days Stargate Defense Systems reported sales of $509,344. This projects to annual sales of $1,357,011 over a 365 day year. This showed a substantial increase in sales from the 2001 Profit & Loss Statement showing annual sales of $549,526.  There were big gaps in the financial data provided and there was no support for the $10,000,000-$30,000,000 numbers that Murphy claimed

-40-

were thrown around by Defendants.

Plaintiffs assert that this was the picture of Stargate Defense Systems Corporation which was portrayed by the Defendants' misrepresentations.  Review of these representations however, shows that most of them are expressions of what Defendants hope will happen in the future–contracts for $30,000,000, projected sales pro formas and news articles.

Plaintiffs contend that none of the products listed as the corporation's product line in the "Product Perspective" were products which were ready to market or to sell. The claim that the companies' product mix was heavily focused "on security and components for security systems" is false.  The company's actual products consisted of circuit boards including TENS units and wire harnesses. (Woodruff transcript at pages 119-120, 200-201). Woodruff's claim to Mr. Murphy that the company made cold light lasers for use on animals was false. (Woodruff transcript at 211).  The claim that Q Corporation's government business had gone from "zero to a million dollars almost overnight" in 2002 is not true.

The company had built a dozen circuit boards for a "Mousetrap device" for another company (not the government) and had never done anything else with respect to this technology during the period of Plaintiffs' involvement. (Ross, transcript at 166-168).

The US Army contract executed in 2004 was the corporation's first governmental contract. (Woodruff transcript at 157-158)  The claims made by Woodruff and Ross that there were existing orders for various detectors, deliveries on those orders, and finalized products were false. (Woodruff transcript at pages 208-210, Ross testimony at transcript pages 167-168).  Mr. Ross' argument that the Draeger letter describing the potential market in the sales of products is equivalent to a purchase is

at best a stretching of the facts and more likely is a false or misleading misrepresentation. (See Transcript at 168-170).  Mr. Ross, as a former CPA, knows that there is a substantial difference between a purchase order and a letter describing the potential market for a product.

Plaintiffs assert that instead of being a company with new and innovative products in great demand because they are products which will help make our soldiers and citizens safer in an increasingly dangerous world, Stargate is actually a company which had sharply declining sales of old technology such as wire harnesses and circuit boards and whose new and innovative products were  untested , unproven, and not ready to market. Instead of a company run by management with a strong history of success, Stargate is a company run by management with a history of failure, fraud convictions and victims. Stargate not only did not have a history of government contracts as represented, but Stargate was actually disqualified from obtaining government contracts due to the indictment and conviction of Mr. Woodruff. Stargate had obtained its only government contract by deception and dishonesty.  Mr. Woodruff counters that Stargate's contract with the US Army was a product development contract, it was not for an existing product.  Further, Mr. Woodruff contends that Stargate's "Product Perspective" refers to the products that Stargate is developing.

Finally, Plaintiffs note that the December 31, 2001 balance sheets (Plaintiff's Exhibit 52) prepared by Mr. Ross and presented to the Plaintiffs by Mr. Woodruff (Transcript at 160) in February of 2002 did not include as a liability the "substantial amount of money" owed to Mr. Viviani. (Ross testimony, transcript at 155-157). If the liability to Mr. Viviani had been disclosed it would have shown that Stargate liabilities may have exceeded its assets, depending upon the value of Woodruff's patent.

-42-

The Court finds that some of these statements were false representations and others were statements of future hopes and potential prospects.  Nevertheless, even assuming that these misrepresentations were material to the transactions and were made with scienter by Defendants, the Court finds that the Plaintiffs' alleged reliance on these statements was unjustifiable.

## 2. Justifiable Reliance

A plaintiff is required to demonstrate justifiable reliance in order to insure that a causal connection exists between the misrepresentation and the plaintiff's harm.  *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1516 (10th Cir. 1983).  The Sixth Circuit has adopted a recklessness standard for determining whether a plaintiff justifiably relied on a misrepresentation or omission.  *Molecular Technology Corp. v. Valentine,* 925 F.2d 910,918 (6th Cir. 1991).  In determining whether a plaintiff's reliance was reckless, the Sixth Circuit examines several factors: 1) The sophistication of expertise of the plaintiff in financial and securities matters; 2) The existence of long standing business or personal relationships; 3) Access to the relevant information; 4) The existence of a fiduciary relationship; 5) Concealment of the fraud; 6) The opportunity to detect the fraud; 7) Whether the plaintiff initiated the stock transaction or sought to expedite the transaction;  8) The generality or specificity of the misrepresentations. *Id*.

A plaintiff may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable.  *Zobrist*, 208 F.2d at 1517.  A plaintiff may not  "intentionally close his eyes and refuse to investigate... the circumstances," or "disregard  a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."  *Id*. However, "[o]nly when the plaintiff's conduct rises to a level of culpable conduct comparable to that of

the defendant's will reliance by unjustifiable." *Id*. at 1516.

Defendants' argument that any reliance was unjustified turns on two alternative propositions: that Plaintiffs either a) did not rely upon Defendants' misrepresentations or omissions, or b) Plaintiffs did rely upon Defendants' misrepresentations, but were reckless in doing so because Plaintiffs undertook no "due diligence" to verify the accuracy of Defendants' representations before entering into the disputed agreements. Defendants rely on a recent Fifth Circuit opinion which requires a plaintiff "to demonstrate that [he] pursued [his] own interest with care and good faith and exercised due diligence before entering into the transactions at issue." *Under v. Amitosis, Inc*., 401 F.3d 316, 322 (5th Cir. 2005). In his testimony, Murphy stated that he did rely on the misrepresentations described above. While that testimony, given the Plaintiffs' own behavior, as well as the warning signals and issues seems improbable, the Court will accept his testimony at its face value. The question for the Court then, is whether that reliance was reckless.

Applying the *Molecular Technology* elements in this situation leads to the conclusion that Plaintiffs were reckless.

(1) The Plaintiffs were businessmen who had started and run Spectrum for forty years. Further, Mr. Murphy had worked as a project manager for Lubrizol and had owned a second company, Compact Dynamics, Inc.. (Transcript t 432).

(2) They have had long standing business and personal relationships and had contact with the Defendants over a four year period before the sale of Spectrum.

(3) In addition, Mr. Smith worked at the Stargate facility for a month after the sale and before Plaintiffs filed to rescind the transaction five months after the sale. Moreover, as shareholders of Q

-44-

Corp since January 2002, Plaintiffs should have had access to substantial information about the activities of Q Corp.

(4) There was no fiduciary relationship between Plaintiffs and Defendants.

(5) As noted above, Defendants did make some misrepresentations to Plaintiffs but there was not a lot of active concealment. Rather, Defendants' representations created a moving target which should have raised some red flags for Plaintiffs to investigate. The one thing that Plaintiffs requested and did not get was complete financials, including disclosure of Mr. Viviani's lien.

(6) Plaintiffs had opportunities to detect the alleged fraud.  There were obvious warning signs regarding the many promises and inconsistent representations made by Mr. Woodruff over the course of their four years of sporadic contacts and negotiations.

For instance, while it may have been justifiable in 2001 to believe that Q Corp would go public in 2002, by 2005 it should have been obvious that going public was not in the works.  Indeed, Mr. Woodruff testified that the decision not to go public was made about two weeks before the Spectrum deal. The evidence also made clear that Q Corp (or Woodruff) was in the business of acquiring companies and that he investigated several companies in hopes of acquiring them for little or no money. Mr. Murphy testified that he knew of Q Corp's aggressive acquisition mode and that it led to cash flow problems.  So, while Defendants mentioned companies that they wanted to acquire and overstated their progress to that end, the status of these acquisitions changed frequently.  Q Corp finished some of the acquisitions (Mitchco) while more fell through (Delta Lighting, Nufab, Panelbloc).  Plaintiffs had enough contact with Q Corp and Mr. Woodruff to understand the shifting nature of this landscape.

Even more troubling was the fact that Plaintiffs loaned Q Corp $20,000 in 2002 which was

supposed to be repaid in five days.  The loan was never repaid.  Further, Plaintiffs were not issued

stock certificates for three years and then the name of the company and the price of the shares seemed

to change.  Again, Plaintiffs did not investigate.  Plaintiffs requested three years of financials before the

sale but only received a profit and loss statement from November 1, 2004 through March 7, 2005.

Despite Plaintiffs' assertion that Defendants made representations about sales and contracts worth

$10,000,000 to $30,000,000, the profit and loss statement showed sales of only $509,000 in the five

months preceding the sale.  Extending that number for another seven months shows that sales would not

even approach $10,000,000 much less $30,000,000. The fact that Stargate could not repay Mr.

Murphy's $20,000 loan, could not pay any cash for Spectrum and imposed a five year restriction on

Plaintiffs' sale of Stargate Stock is ample evidence that Stargate had no cash and was a start up

company with hopes of eventually obtaining some success.

Mr. Murphy did contact the Ohio Secretary of State before the Spectrum sale and learned that

there was no record of Stargate Defense Systems Corp.  Mr. Murphy also consulted a lawyer before

signing the Purchase Agreement.  Incredibly, Mr. Murphy acknowledged that he did not tell the lawyer

that he had requested three years of financials and had received less than one year of financial data.

Nor did Mr. Murphy tell him about his call to the Secretary of State or that the 2002 loan had never

been repaid or that the shares of stock purchased in 2002 were not issued to him until March 16, 2005.

He did not discuss the fluctuation of share prices.  Finally, he did not review his notes containing the

various representations that had been made to him by Defendants over the three to four year period.

(11/02/05 Transcript at 456-57).

(7) Plaintiffs initiated these transactions and were anxious to sell Spectrum and retire.

-46-

(8) The representations made by Defendants were both general and specific. The general representations, press and pro formas, were forward looking or puff pieces which by their nature were not particularly reliable. The specific statements could have been confirmed or disproved with a minimal due diligence investigation.

The balance of the *Molecular Technology* factors weighs heavily against Plaintiffs and highlights that Plaintiffs recklessly failed to conduct due diligence. Plaintiffs were aware of the moving target of promises and representations, but chose to follow Woodruff's words rather than demand an audit of Stargate and its predecessors and financial documents over a three year period. Plaintiffs went forward with the transaction without receiving complete financials, despite having made a request for more complete data, and without proper legal advice or financial analysis. Further, they knew there was no record of Stargate at the Ohio Secretary of State's office. Going forward with the transactions based upon Defendants' representations alone was reckless, particularly when Plaintiffs claim that their Company, Spectrum, was valued at more than One Million dollars.[4] Only a very desperate seller or, as Murphy noted, two trusting old fools, would have relied on Mr. Woodruff's words over this time period without significant investigation. Based upon the Court's observation of Mr. Murphy during

_____

[4]Over the years Spectrum was a marginal company. It had received sporadic contracts and enjoyed limited success. It was not successful enough to generate any interest from any company other than Stargate during the four years that Plaintiff's tried to sell it. Nevertheless, Mr. Murphy asserted that the company was worth over a million dollars and points to the Purchase Agreement which sets the selling price at $1,008,000. Just as there was no accounting or valuation done of Stargate, there was none done of Spectrum. Thus, it appears that both sides were comfortable with random valuations. In any event, given the 5 year restriction on selling their Stargate stock, Plaintiffs clearly were aware of the "if-come" nature of this transaction. Regardless of whether they were ever able to sell their Stargate stock, the transaction did permit Plaintiffs to achieve their goal of keeping their employees employed.

trial, Mr. Murphy did not appear to be a fool or an unsophisticated, untutored business novice.

Plaintiffs were, however, anxious to retire, as both Plaintiffs were past retirement age and Mr. Smith

had health problems.  Although Plaintiffs advertised and tried  to sell Spectrum over a four year period,

Mr. Woodruff (Stargate) was the only potential purchaser.  This stock for stock deal with Stargate was

Plaintiffs' only option to sell Spectrum. As Plaintiffs could not continue to work indefinitely, they agreed

to this deal despite the many obvious risks inherent in the transaction.  Thus, Mr. Murphy was right.

Only a desperate seller like him and Mr. Smith would have relied on Mr. Woodruff's words without

significant investigation.  The risk they were willing to take in this instance just to unload Spectrum to a

company that was willing to continue its operation was reckless and their reliance on Defendants'

misrepresentations was unjustified.[5]

      Moreover, after the March 18, 2005 transaction closed and Mr. Smith had been working at

Stargate/Spectrum for a month, Plaintiffs definitively knew of Mr. Woodruff's conviction, the loss of the

government contract and Mr. Viviani's lien.  In April, Mr. Murphy was asked to write a letter in

support of Mr. Woodruff to the Judge in Mr. Woodruff's criminal case, which Mr. Murphy did.  In

early June, Defendants asked Mr. Smith if the Plaintiffs wanted to rescind the sale as a result of these

events.  Mr. Smith and Mr. Murphy both told Defendants that they did not intend to rescind the deal.

Almost immediately thereafter, Spectrum received a very lucrative contract. At that point, Plaintiffs

---

[5]Although not a concept usually involved in fraud cases, in this case the course of conduct between the parties raised all kinds of red flags that a normal seller would have investigated, and indeed, would have been required to investigate.  Plaintiffs, having no other options, refused to acknowledge the red flags and thus can be said to have assumed the risk that these representations were false.

complained that they did not like the way that Defendants were running Spectrum after the sale; using

Spectrum's newly found cash for the other businesses and causing problems with suppliers and

insurers.  This time line is very troubling and works against Plaintiffs' protestations that they were

mislead by Defendants' representations, much less that they relied on these old misrepresentations.  The

heart of Plaintiffs' complaint are Defendants' post-sale actions and the fact that Spectrum suddenly

became more valuable.  These events after the sale can not be used to rescind the sale under Rule 10b-

5 or state law fraud.

Based on all of the evidence submitted, the Court finds that Plaintiffs failed to demonstrate the

justifiable reliance element of the five part test under Rule 10b-5 or common law fraud and that

Defendants are entitled to judgment on these claims.[6]

## CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs are entitled to judgment on their

Ohio statutory claims under RC §1707.44(B)(4) and  RC §1707.44(D) as to first two stock purchases

and under RC §1707.44(C)(1) with respect to the February 4, 2002 transaction.  Further the Court

finds that the first two transactions are voidable under §1707.43.  Accordingly, Plaintiffs are entitled to

recover the purchase price of the shares in the first two transactions–$32,000.  The Court finds that

Plaintiffs have not established their common law fraud claim or their Federal Securities/Rule 10b-5

-----------------------

[6]Because Plaintiffs have failed to demonstrate justifiable reliance necessary for both their 10b-5 claim and their common law fraud claim, the Court has not reached the issue of loss causation.  The Purchase Agreement signed by the parties does not permit the Plaintiffs to sell their shares of Stargate for five years following the transaction.  After that time, Defendants guaranteed that the shares would be worth at least $30 per share.  Defendants therefore argue that Plaintiffs have not incurred a loss at this time.

claim and that Defendants are entitled to judgment on those claims.

        IT IS SO ORDERED.


                                     /s/*Donald C. Nugent*
                                     Judge Donald C. Nugent

DATED:    March 20, 2006